MAY and MAY, Executors, *versus* EASTIN.

The refusal of a Chancellor to dismiss a bill, for want of security for costs, is not a ground for reversing a decree in equity—excuses for a non-compliance with the letter of the statute, being necessarily, subject to the discretion of the Court.

In determining between an absolute sale and a mortgage, the Court, will take the intentions of the parties, from a view of all the circumstances: and where it is evident that a *prima facie* absolute sale, was intended as a pledge, the Court will relieve against the sale, and suffer a redemption.

Where A, having slaves levied on under execution in favor of the Tombeckbee Bank, and being about to discharge the same by payment of the notes of that Bank, was hindered from so doing by the representations of B, that it would not be a good payment, but who, on an agreement with A, paid off the execution *in the same money,* and took a purchase of one of the slaves, (with a condition of redemption in three months:) the Court, on a bill filed after the expiration of three months, held the transaction a mortgage, and decreed restitution, on the payment by A, of *one half* the nominal value of the Tombeckbee Bank notes, paid by B, in discharge of the execution.

The general rule, that a mortgagor, seeking to redeem, must pay costs, does not apply to a case, where the mortgagee sets up an absolute title in himself.

This case came up by appeal from the Circuit Court of Greene, exercising Chancery jurisdiction. The bill was filed by Eastin, praying the redemption of a negro slave.

The facts, so far as material to the case, were as follow:

Eastin became indebted to the Tombeckbee Bank, and to secure the payment of the amount due, executed his deed of trust for several negro slaves, and other property to the said Bank; subsequently, under an arrangement with Buchannon, the testator of the defendants, the said property was purchased under a sale by the Bank, and delivered to the complainant, under a certain specified agreement, whereby the debt due by complainant to the Bank was to be discharged, and the property, then in the possession of Eastin, to become absolutely his. After Buchannon's death, there being a balance due on the debt aforesaid, James May, one of the defendants, procured judgment thereon, and had execution issued on the same, in the name of the Bank. The execution being in the hands of the sheriff, a friend offered to loan the complainant the amount of his debt to the Bank, in Tombeckbee money, then fifty per cent. below par; which the sheriff, under May's directions, refused to receive. May then selected one of the complainant's most valuable slaves, and proposed to take the negro, and advance the amount of the execution, and if complainant, in three months, refunded the money, the slave should be returned. The complainant having assented to this proposition, the said May paid off and satisfied the execution, in *Tombeckbee money*, and took the slave into his possession.

The Chancellor, on a final hearing, decided that the transaction was a mortgage; and decreed restitution, on the payment by complainant, of one half the nominal value of the Tombeckbee notes, paid by defendant in discharge of the execution against complainant's property. The Court also decreed costs against the defendants to the bill.

The assignments of error, appear in the opinion of the Court.

ERWIN, for Plaintiff in error, contended—That the Court erred in refusing to dismiss the bill for want of security for costs, pursuant to the statute, Eastin being a non-resident. Security was regularly required on the 18th of September, 1829; and at the next term (March, 1830) the Court refused to dismiss the suit, on motion of the present plaintiffs in error, but permitted security then to be given for the retrospective costs—six months having elapsed after security was required, and during which no security was given. The statute requires the suit to be dismissed, unless security be given with the clerk of the Court within sixty days after the notice. The language is plain, positive and imperative. Shall its requirements be observed or not? *Aik. Dig.* 262. The Court improperly rejected the transaction as a mortgage: the Bank debt was paid off by May. But in the progress of the transaction, May offered to take the two slaves, until Eastin should pay off the amount. This would have been a mortgage; as it would have been *intended to secure the payment of money;* and that is the test. But Eastin did not accede to this proposition. He, on his part, proposed to make an absolute sale to May of the girl Dorcas, in consideration of his paying off the Bank debt; and to this May acceded. May indeed, afterward, agreed that if Eastin would repay him the money and certain other dues, within three months, he might have the negro again. This was no mortgage. It was not even a conditional sale; because this proposition was made after the sale had been completed. To have made it a sale, it should all have been done at

the same time.   This was not a contract for the se-
curity of money, but an absolute sale, as May states
on his oath.   Can such a sale be explained away and
converted into a mortgage?   Certainly not.   There
were no circumstances of fraud in the case.   The
debt discharged by May, was equal to the value of
the girl.   If, after this transaction, the girl had
died, is there any doubt that · it would have been
May's loss?   There can be none.   May would have
had no remedy for the money he had paid.   The
bank debt was discharged, and the slave had been
received in satisfaction.   Such being the case, this
could not have been a mortgage.—4 *Kent's Com.* 38.
1 *Pow. on Mort.* 120 to 127, *note* 2—138, *note p.*

The fair criterion, whether a conveyance be a
mortgage, is, in the remediss being mutual, the ven-
dee having all the remedies of the mortgagee.—*Ham-
mond's Dig.* 363—2 *Cranch,* 237.   A clause of privi-
lege of redemption alone will not be sufficient of it-
self, to convert the transaction into a mortgage,
where there is no bond or covenant for the payment
of the purchase money.

Eastin says, a friend offered to lend him the a-
mount in Tombeckbee money, to pay off the execu-
tion.   May denies that any was offered, but admits
that he instructed the sheriff not to receive such
notes, as he had been informed they would not have
been a good payment.

The sheriff was not bound to receive these notes.
If it had been a suit against Eastin, the notes would
not have been a set-off to the debt.   The rule of law
is clear, that a defendant can not go out, and buy up
debts to subject a plaintiff to costs.   Surely then
Eastin could not offer these notes in payment, where
he was not even defendant in the action.   The exe-

cution called for gold or silver, and the Bank would not have been bound to receive any thing else. Eastin received *par* currency in the first instance; he could not have been injured in being bound to make payment in the same. A Bank demanding payment of another Bank, is not bound to receive its own notes in payment, because bank, bills are only payable at the counter of the Bank where they were issued.—3 *Starkie's Ev. Part* 4, 1392—*Cox' Dig.* 81; 19 *Johns.* 332.

Where a bill is filed by a mortgagor to redeem, there being still a balance due, the rule is, that the complainant must pay costs. The Court, therefore, erred in awarding costs against May.

PECK, *contra.*—In regard to the motion to dismiss for want of security for costs, the record does not shew the fact that the complainant was a non-resident, nor that the same was admitted. The language of the motion says so; but that is no evidence; it is only an allegation.

In cases of this kind, the Chancellor must have discretion. Suppose it had been shewn, that from the absence of the clerk, security could not have been given, would the Court have been right in dismissing for that reason? The various reasons which may have induced the Court to refuse to dismiss, can not now be looked into, in the existing state of the record.

As to May's contract in taking the girl, it was not even a mortgage, but a pledge. A mortgage conveys the title: a pledge does not. In a mortgage, a man can not bring *trover* or *detinue*, after tendering the amount: in a pledge he may. It is said there must be an obligation to pay the money, where there is a pledge or mortgage. So there was in this case, as

the answer shews, an express promise on the part of Eastin. The answer speaks of the transaction as a mortgage or pledge, and speaks of allowing Eastin to *redeem*, a term not applicable to a sale. If the sale had even been absolute at first, the subsequent agreement would, according to the doctrine of *Kent*, have rendered it a mortgage. I do not admit that if the slave had died, it would have been May's loss. Eastin would still have been bound to pay the money. If it had been an absolute sale, instead of a temporary pledge, May would, in all probability, have taken a bill of sale.

The answer it is said, must be taken as true. That is the principle : so must the testimony of a witness be taken as true. But a witness may contradict himself; and so may an answer contradict itself. If, therefore, in one part of this answer the sale to May is said to be absolute, yet if other statements in the answer shew that it was but a pledge or mortgage, we are not bound to regard it as a sale.

The defendant, May, seems to have played an extraordinary part in this transaction. The execution was against himself; yet he controls it and directs what kind of money shall, and shall not be taken. He will not let Eastin pay off the execution in Tombeckbee money; imposes severe terms upon him; gets his slave into his own possession, and then actually pays off the execution in this half-price money. Under these circumstances, the Court was surely right in not requiring more of Eastin than the value of the paper paid by May.

As to costs, the general rule is as stated by the counsel for the plaintiff in error; but it has many exceptions. Whenever there has been an unconsciencious defence set up by the mortgagee, or when he

has thrown improper obstacles in the way of redemption, the mortgagor is entitled to costs. The pledgee, here, by refusing to permit redemption, except upon terms not equitable, was the cause of suit, and of course, of the costs ; and therefore, that he should be subjected to the payment of costs, is no more than equitable.

By Mr. Justice HITCHCOCK :

The appellants contend for a reversal of the decree in this case, upon the following grounds :

I. That the bill should have been dismissed for an improper joinder of Patrick May with James May ; and also because the defendants are charged in their representative and individual characters.

II. That the Court had no power to refuse the motion to dismiss the bill for want of security for costs; the statute being, as they contend, peremptory.

III. That there is error in the interlocutory decree of the Chancellor.

1. In deciding that the first purchase by Buchannon, was a mortgage.

2. In deciding that the purchase of Dorcas, by James May, was a mortgage ; and,

3. In requiring Eastin to pay to May only one half the nominal amount paid to the sheriff by May in Tombeckbee money.

IV. That the Chancellor who made the final decree, erred in giving costs to the complainant.

These several positions will be examined in the order in which they have been stated : and,

1. The bill charges a mortgage to have been made by the complainant to the defendant's testator. It charges also, that the last transaction, in the payment of the execution, and sale of Dorcas, was

a mortgage. It necessarily required answers from both of the defendants, and an account relating to their representative character, and as to James May, an individual account : it was therefore impossible to have a full and final hearing of the whole matter without making the executors of Buchannon parties; and the result, shewing that a decree was required to be rendered against one only of the defendants, and that in his individual character, does not present matter of error, and even if there had been improper parties to the bill, James May cannot complain on that account, if there is no other error in relation to himself.

II. As to the alleged error, in not dismissing the bill for want of security for costs, we think that was a matter in the discretion of the Court below. Though the language of the act is peremptory, and declares that when the security is not given within the time required, after notice, the bill shall be dismissed ; yet the act being intended for the security of the defendant, and being no bar to a subsequent suit, the Court below, it is considered, has the power to control the suit, and to refuse the motion upon such terms as his discretion may dictate. This has been the invariable practice on the Circuit, and we are not at liberty to give any other construction to the act. There are so many circumstances which may arise, to excuse a party for not strictly complying with the letter of the statute, that to refuse to the Courts below any discretion, would often be productive of great injustice.

III. The third position to be discussed, involves the merits of the bill, and to it the attention of the Court has been principally directed.

1. The first division of this branch of the subject,

as to the character of the sale to Buchannon, we shall bestow but little time upon. It was evidently a mortgage: the circumstances and manner of the sale, the instructions contained in Buchannon's letter to John May, (though he calls it a purchase,) the payments made by Eastin on Buchannon's note in the Tombeckbee Bank, the possession by Eastin of the property, and the final settlement by James May, and relinquishment of the balance of the property after he had taken the slave Dorcas, all conspire to give to the transaction the character of a mortgage ; and indeed we do not understand the appellants to contend for any other construction of the transaction, except in the event of our setting aside the sale of that negro : we shall therefore leave that part of the case, without further enquiry, and proceed,

2. To enquire whether Eastin has made out a case in his favor, in relation to the girl Dorcas.

He states in his bill, that after the sheriff had, by the directions of May, refused to receive Tombeckbee money in discharge of the execution, which, he avers, that he had found a friend who had agreed to advance for him, and which he avers to have been then fifty per cent. below par : he (May) " selected the favorite and most valuable negro, and proposed to Eastin that he would advance the amount of the execution if Eastin would consent to let him take her with him ; and that if in three months Eastin should refund the money the said negro should be returned, otherwise to be absolutely his property." To which proposal, the said Eastin says he agreed, and that as soon as this was settled, the said May, at once paid the sheriff in Tombeckbee money.

The defendant states in his answer to this part of

the bill, "that after the levy by the sheriff upon two of the negroes, the said Eastin did speak of paying off the execution in Tombeckbee money, which was then under par, to which he (May) objected, because he had heard from a gentleman in whom he had great confidence, that the Cashier of the Bank had directed the sheriff of Clarke county not to receive the notes of the Bank in payment for its debts, from which he was induced to believe that the Bank would not probably receive their own notes in payment of executions ; and being extremely anxious to have the business finally settled, without any further difficulty, cost or trouble, he was unwilling to receive any money but such as he knew would be taken by the Bank, without objection : that no notes of said Bank were produced or tendered by Eastin, neither does he believe he had any, and from his notorious want of credit and punctuality, he thinks it doubtful whether he could have procured any." He admits "that he did, in his *individual capacity* ultimately pay off said execution in Tombeckbee money, by assuring the sheriff that if the Bank would not take their own bills, he would be responsible in good money : he avers that he did not make a solitary cent by it, as he procured the notes from a friend, to whom he afterwards paid back the full amount in good money, without any discount or deduction." The answer further states, "that after Eastin spoke of paying the execution in Tombeckbee money, he (May) proposed to take two of the negroes, Margaret and Dorcas, and keep them in pledge, until he (Eastin) would raise the money due on the execution, and pay it off, which Eastin would not consent to. But that Eastin in his turn, proposed that May should take one of the negroes (which ever he chose) absolutely, and pay off

the execution, to which May agreed, and under which agreement he took Dorcas." He then says, " that after the business was all completely closed, that he, (May) informed Eastin that he did not want to keep the negro, and that if he would in three months pay him the said money, the amount *he had paid on* the execution, and eighty dollars for his time and expenses in attending to the whole of the business, for which he held his testator's estate liable, and also the sum of forty two dollars and sixty four cents paid by his testator as a part of one of the instalments on the note due the Tombeckbee Bank, amounting in the whole to three hundred and thirty dollars, with interest thereon, that he, Eastin, might redeem and take back the negro, which the said Eastin promised to do."— The answer farther states, that " the said sum was not paid within the three months, and that on two occasions since, the said J. May has offered to return the negro to said Eastin, if he would pay the money and interest; and that on the last occasion he informed said Eastin, that unless he did pay the amount he (May) would be compelled to sell her, and propos to him (Eastin) to consent to his selling her to John Gayle, jr. his brother in law, to which he (Eastin) consented."

Eastin in his bill, states that " he has proposed to leave the subject of their differences to arbitration, but which proposition the said May rejected, and that he refuses to return the negro to Eastin until he shall be paid the amount of the execution in good money, with the eighty dollars, his expenses, &c.;" he charges the negro to have been worth, at the time of her delivery to May, the sum of five hundred dollars, and her hire to be worth ten dollars per month.

May admits that he has refused to arbitrate; de-

nies that there are any differences to settle ; avers the negro not to have been worth, at the time he received her, more than three hundred and thirty dollars, and that her hire is not worth more than five dollars per month.

These are all the material statements in the bill and answer, relating to this part of the case. They were submitted without testimony on either side, and it became the Chancellor to give such a decree as was consistent with justice, and the rules of equity. There is no written evidence of the transaction, the whole case depends upon the recollection of the parties, of what transpired at the time. It is not therefore strange, that under the circumstances in which the parties present themselves before the Court, and the state of feeling exhibited in the criminations and recriminations with which the bill and answer both abound, that there should be some discrepancies in their respective relations of the transaction.

If we take the statement in the bill, as containing the true history of the transaction, we should not hesitate to say that Dorcas was delivered as a pledge, which is defined to be " a deposit of goods redeemable on certain terms, with or without a fixed period of redemption," in which the delivery of the goods to the pawnee is essential to its validity, and when a redemption is allowed after the day of payment, if one be fixed."[a] <sup>a</sup>4 Kent's Com. 138.

If we take that part of the defendant's answer which relates to this matter, we should say that it was an absolute sale, with an agreement for a repurchase within a given time, and which is totally distinct in its character from that of a pledge or mortgage, and which though narrowly watched, is still valid, and in which the time limited for the re-pur-

chase must be strictly observed, or the vendors right to reclaim his property will be lost. In the first case there is, in fact, no sale or transfer of title, the property remains in the pawnor, and the equity of redemption is secured; in the other, the title is transferred, and the transaction is considered strictly as an independent dealing with a stranger, and equity can give no relief.

In cases of this kind, it is the duty of the Court to get at the character of the conveyance, by looking into the intention of the parties, from a view of all the circumstances of the transaction. In this view, it is not very material to criticize the precise language which either party employs in the relation of it, or to stop long in scrutinising the various propositions made, or by which party they were proposed, whatever that may be, if the transaction in the first instance appears to have been intended as a pledge or mortgage, with a proviso for a re-conveyance within a certain time, such circumstance will vitiate the sale, and turn the absolute conveyance into a mortgage, and the proviso will be rejected as repugnant to the rule of equity, that the right of redemption can not be limited or restrained.[a]

[a] Pow. on Mor. 138.

In this case, May, though the defendant, (as executor of Buchannon) to the execution; must be viewed as the judgment creditor of Eastin, having his property in the hands of the sheriff; Eastin's circumstances are stated by him and admitted by May to be embarrassed, so much so, that May doubts his ability to raise enough Tombeckbee money at half its nominal value, to pay the execution, and which, even if he had been able to do, he had refused to permit the sheriff to receive. May admits that he did receive the negro for the amount of the execution, which was

two hundred and seventeen dollars; that immediately after the purchase was made, he informed Eastin that he *did not want the property*, and that he voluntarily offered to return it, upon being reimbursed, what was, as he conceived, but justly due to his testator's estate; that to this proposition Eastin agreed: Eastin considers the property to be worth five hundred dollars; May does not consider it worth more than what he is to receive, and on two several occasions after the time for redemption is past, he calls upon Eastin to redeem; and on the last, asks permission to sell the property to the brother in law of Eastin. The negro was a family negro, raised by Eastin's family, and received by him on his marriage, and either she, or one other in a similar situation must inevitably be sold to pay this debt, unless some arrangement, for a pledge or mortgage can be made. Is it not then, under these facts, the duty of the Court, to vitiate this transaction as a sale, and consider it a mortgage? Did not the relation of creditor, in which May stood, give him such an advantage over Eastin as to enable him to dictate his own terms; and would not the Court, if the transaction had been reduced to writing, and presented itself in the language employed by May in *his* answer, be authorised to give Eastin the right to redeem? If Eastin's estimate of the value of the negro is correct, she was worth more than double the amount of the execution; and if it could have been paid in Tombeckbee bills, at fifty per cent. discount, she was worth more than four times the debt. If May's estimate is correct, as to her value, and we are to take his statement that he did not *wish to keep her*, to be true, this object was only to secure his debt, and exonerate the estate of his testator. The whole trade, whatever it was intended to be, was made at

the same time, and must be taken as one transaction, and whether the proposition for the sale and re-sale came from May or from Eastin, and whether it was before or after the execution was satisfied, the inducement so far as Eastin is concerned, remained the same, and the power of May to dictate the terms, was also the same.

There is one other circumstance which weighs very much in my mind, to give Eastin the right of redemption. It is this, after May had delivered the execution to the sheriff, and the levy had been made, there can be no doubt but that the estate of Buchannon was discharged, and the sheriff had become responsible for the debt; and whatever May may have thought on the subject, he had, in reality, no right to dictate in what money the execution should be satisfied. That as an honest man, he was bound to communicate to the sheriff such information as he had received, and upon which he relied as to the inclination of the Bank to refuse receiving its own bills in payment, is undoubtedly true : but he had no right to control the sheriff : he was not the agent of the Bank, or the guardian of the sheriff. Eastin positively states that he could have raised the Tombeckbee money through a friend, and that he was prevented by May. May admits that Tombeckbee money was under par, and that he refused to receive it ; it is true that he doubts Eastin's ability to have raised it; but of this he could not judge, and he had no right to give an opinion. This unauthorised interference, together with the fact, that he did himself, immediately after the purchase of the negro, pay the debt in those bills, places the transaction in a still stronger light than it would otherwise appear, in favor of Eastin. That the information he received, and upon

which he alleges he refused to let Eastin pay in Tombeckbee bills, could not have been correct, is evident as it is not pretended in the answer that May was ever called on by the sheriff to make any farther payment to him; it may therefore be assumed that the Bank was willing, and did receive the bills of its own Bank in payment of this debt, and that May, by his authority, prevented Eastin from the benefit of such payment, and it is equally evident, that if Eastin had been permitted to make his own terms with the sheriff, he would not have sold his negro to May.

Under these views of the case, and taking into consideration the well known rule, that Courts have always leant extremely against contracts of sale with liberty to re-purchase, being always inclined to bring them to be cases of redemption :[a] this Court are of opinion, that there was no error in the decree of the chancellor below, in considering this transaction as a mortgage.

[a] Ves. sr.406.

III. Did the Court err in requiring Eastin to account for only one half the amount of the nominal value of the Tombeckbee money? We think not: by setting aside this sale and opening the transaction, and requiring such an account as would do justice to the parties, we think that May is only entitled to so much as Eastin could have paid the debt with. Eastin expressly charges, that Tombeckbee money was then fifty per cent. below par, and that he could and would have paid the execution in that money. May admits that money to have been below par, but how much, he does not state; he therefore substantially admits the truth of that allegation of the bill, and in taking upon himself to pay this execution for Eastin, he was bound to pay it on as

good terms as Eastin could have done it, and it is of no consequence that he paid a friend the full amount of the Tombeckbee bills in good money. The enquiry is, not how much he did make, but how much Eastin could have saved.

IV. There is only one point remaining, which is as to the costs of the suit.

As a general rule, it is true, that when a mortgagor comes to redeem, he must pay the costs of the proceeding. Yet there are cases in which the mortgagee is not allowed costs, but when he has been decreed to pay them; and one of the instances of this kind is, where the mortgagee sets up an absolute title in himself, which is the case here.[a] This Court, however, will not generally reverse a case after a full hearing upon the merits, merely on the ground that costs are decreed, though they might not have decreed costs, if the case had been before them as an original bill.

The decree must therefore be affirmed.